IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BUDDY F. MITCHELL, II, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:10-cv-0457 |
| ) | |
| METROPOLITAN GOVERNMENT OF ) | Senior Judge Thomas A. Wiseman, Jr. |
| NASHVILLE AND DAVIDSON COUNTY, ) | |
| TENNESSEE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Buddy F. Mitchell, II filed this action against Defendant Metropolitan Government of Nashville and Davidson County ("Metro"), alleging claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.* He also asserts a state-law claim for breach of contract. Now before the Court is Metro's Motion for Summary Judgment (Doc. No. 21), in which the defendant asserts that it is entitled to judgment in its favor as a matter of law as to all claims asserted against it. For the reasons set forth herein, the Court finds that, although there are numerous factual disputes, there are no *material* factual disputes and that Metro is entitled to judgment in its favor as a matter of law as to the discrimination claims. Accordingly, the defendant's motion for summary judgment as to those claims will be granted. The Court, having concluded that it will dismiss the only claim over which it has original jurisdiction, will decline to continue to exercise jurisdiction over the remaining state-law claim for breach of contract.

I.     **FACTUAL BACKGROUND**

The undisputed facts in this case are sufficiently embarrassing to the plaintiff that the Court is frankly amazed that he has opted to prolong and even extend his embarrassment by filing this lawsuit. The basic facts are as follows:

Mitchell was employed by the Metro Police Department from September 1, 1975 until May 9, 2009. He was promoted to the rank of sergeant in 1990. On the last day of his employment with the

Police Department, Mitchell was fifty-three years old.

The events leading to a disciplinary investigation into Mitchell's actions began in 2007 when Mitchell overheard two other officers talking about a female resident of Millersville, Tennessee who drove a white TransAm with a personalized license plate that read "Sugar Pants" or something similar. Mitchell admits that he used the Metro Police Department's computer system to "run the tag" for this individual and thereby to ascertain her identity and where she lived. Mitchell agrees he knew or should have known that accessing the Police Department's database for non-official reasons was in violation of department policy and procedure.

Plaintiff later used the investigation of a suspect in which Mitchell was not actually involved as a pretext for initiating contact with the woman who drove the white TransAm, in the process violating several more departmental policies. He obtained the woman's telephone number from her at that time. Over the course of the next several months, 117 telephone calls were made to this woman from the Metro Police Department cellular telephone assigned to Mitchell, though Mitchell claims he called her no more than twenty or twenty-five times and only actually had a conversation with her approximately nine times. (Mitchell Dep. 95:21–25; 97:1–4.) Mitchell cannot explain why his telephone records reflect much more numerous calls. (Mitchell Dep. 97:7–10, 97:23–98:6.) Mitchell claimed he called the woman initially out of "curiosity," thinking he "might want to date her" (Mitchell Dep. 93:4–7), but later decided he did not want to establish a romantic relationship with her. (Mitchell Dep. 102:7–12.)

On March 15, 2008, the woman called the Police Department, North Precinct, to report that a Metro police officer had been harassing her. The woman spoke with Sergeant Terri Little. According to the report written by Sergeant Little, which was based on her telephone call with the woman, the woman called to complain about an "unknown uniformed sergeant" who had been "calling her constantly asking her to go out with him and wanting her to go to a motel with him." (Little Dep. 5:22–25 & Ex. 1 (Doc. No. 15-6, at 5.)

In response to the woman's complaint, an investigation ensued. Mitchell was interviewed by investigators assigned to the Police Department's Office of Professional Accountability ("OPA") on July 31, 2008. Mitchell was represented and accompanied by legal counsel at the time. Mitchell does not dispute that he was aware that, when providing information to the investigators with the OPA, he was

required to be truthful. (Mitchell Dep. 121:4–9.) He also knew that providing false information could result in his termination. (Mitchell Dep. 121:10–14, 123:13–16.) Mitchell also understood it was important to tell the "whole truth," (Mitchell Dep. 125:2–8), but acknowledges he nonetheless left out information he "didn't think was relevant." (Mitchell Dep. 123:22.) Specifically, he initially claimed it was a mere coincidence that he happened to knock on the woman's particular door the day he was allegedly pursuing an investigation of a case he was not involved with. He later clarified that testimony after a recess during which Mitchell consulted with his attorney.

Ultimately, the OPA accused Mitchell of violating several provisions of the Police Department's General Orders, including "Adherence to Policy & Rules of the Metropolitan Government," "Adherence to Law," and "Conduct Unbecoming an Employee of the Department." In April 2009, Lieutenant Gordon Howey met with Mitchell and Mitchell's attorney at the time to discuss the charges against him. After discussions with the OPA, Mitchell agreed to accept a twenty-day unpaid suspension to resolve the charges. This proposed settlement, however, was subject to approval up through the Police Department's chain of command.

On May 6, 2009, then-Deputy Chief of Police Steve Anderson was made aware of the OPA's investigation into Plaintiff's conduct. On May 7, 2009, Anderson requested that a copy of the investigative file be forwarded to him. Based on his review of the OPA's file and Mitchell's statement contained therein, Chief Anderson concluded that, in addition to engaging in inappropriate and harassing conduct, Mitchell had repeatedly provided false information to the OPA investigators. Chief Anderson thereafter summoned Mitchell to meet with him at the North Precinct where a departmental meeting ("Compstat" meeting) was in progress. Chief Anderson asked Mitchell if he had read the transcript of the statement he had provided to the OPA. Mitchell stated that he had not. Chief Anderson gave him a copy and told him he should read it before discussing the matter. According to Mitchell, he was then given only fifteen minutes to review the statement and was not allowed the time to consult with his attorney.

At approximately 10:00 a.m. on the morning of May 9, 2009, Chief Anderson met privately, in a closed meeting room, with Mitchell and his supervisor, Commander Damian Huggins, as well as Deputy Chief Louise Kelton. From this point, the parties' versions of what occurred differ substantially. Mitchell claims that Chief Anderson told him "this is your last day as a law enforcement officer, you're going to

have to make a decision," and then gave him fifteen minutes to decide whether to resign or to be terminated and lose all his benefits. (Mitchell Dep. 165:4–7.) Mitchell claims he "heard the word termination" and then "kind of went in a blur," and all he could think about was that if he was fired he would lose his pension and all his benefits. (Mitchell Dep. 165:10–20.) He asked Chief Anderson if he could have the weekend to think about it and speak with his attorney, but was told he had fifteen minutes to decide. The Chief, Huggins, and Kelton left the room. Five minutes later, Lieutenant Johnson came in and told Mitchell he was supposed to type out the plaintiff's letter of resignation. Mitchell claims he asked Johnson whether he would lose his pension if he chose not to resign and instead was fired. Johnson told him he honestly did not know. Although his deposition testimony is unclear, Mitchell apparently contends that he decided to resign in order to keep his pension and benefits. He characterizes this resignation now as a constructive discharge.[1]

According to Chief Anderson, however, when he, Commander Huggins, and Deputy Chief Kelton met with Mitchell the morning of May 9, Anderson explained to Mitchell that he "was not going to approve the previously submitted settlement offer and that the investigation would be reopened to include an inquiry concerning his truthfulness." (Anderson Decl. ¶ 9.) Anderson advised Mitchell that he intended to "decommission" him, pending resolution of the matter, unless Mitchell could offer a reason why he should not take that course of action. (*Id.*)

---

[1] Metro has filed a Motion for Sanctions for Plaintiff's Spoliation of Evidence (Doc. No. 18). The motion is based on the fact that during his deposition Mitchell stated that he "did keep a tape recorder when all of this incident [sic] and . . . tried to record a lot of the conversations that was going on for [his] protection." (Mitchell Dep. 19:22–24.) He later stated he "had a tape recorder" with him during his meeting with Chief Anderson. (Mitchell Dep. 174:5.) When asked if he actually recorded that particular meeting, Mitchell responded equivocally: "I'd have to listen to it. Like I said, when I got home, I already had my uniform off, my top. I took everything, threw them in a box. My wife took the box and put them in the barn and said, if you got anything else to do with this police department, I don't want it in the house; I want it out in the barn." (Mitchell Dep. 174:7–12.) In other words, as Mitchell later clarified, he did not know whether he had actually tape-recorded the conversation with Chief Anderson, but he promised to look through the boxes to see if he had it when he got home, and if he did, to provide a copy of the tape. (Mitchell Dep. 174:14–16.) During written discovery, which preceded his deposition, Mitchell never identified any tape recordings, nor did he produce any tapes. Mitchell's counsel later informed Metro's counsel that, "while the tapes once existed, they must have been 'thrown out at some point.'" (Klein Decl. ¶ 11.)

Metro seeks a court ruling that Mitchell intentionally either destroyed or failed to preserve the tape, and moves the Court to sanction Mitchell by, at a minimum, permitting a "negative inference that the contents of the tapes would have been unfavorable to Plaintiff," and issuing an Order precluding Mitchell "from tendering evidence contrary to the negative inference." (Doc. No. 19, at 7–8.) Because the Court finds, as set forth below, that Metro is entitled to summary judgment without the need of such a negative inference, the Court does not reach the merits of Metro's motion for sanctions.

At that point, Mitchell "initiated an account of the events similar to the original false account he had given OPA investigators and later retracted." (Anderson Decl. ¶ 10.) Anderson stopped him, reminded him that the evidence did not support this story, and told him he would recommend that Mitchell's employment be terminated. Mitchell, according to Anderson, continued to insist that his account of the events was truthful. Anderson stopped him again and reminded him that as a civil servant, he would be entitled to a hearing and to further contest any disciplinary action, but that it would remain Anderson's recommendation that Mitchell's employment be terminated.

According to Anderson, Mitchell asked if he would be allowed to resign instead. Anderson allegedly told Mitchell that "he was entitled to all the civil service procedures but that he was also entitled to resign." (Anderson Decl. ¶ 12.) Anderson declined to give Mitchell the weekend to think about it; instead he told Mitchell he could take until the end of the Compstat session to make a decision, and that Anderson would make a decision concerning Mitchell's work status and assignment at that time. Anderson returned to the Compstat meeting. While the meeting was still in progress, approximately one hour later, Mitchell, according to Anderson, voluntarily submitted his resignation to Lieutenant Andrea Swisher. Anderson had no further conversations with Mitchell about the matter. (Anderson Decl. ¶ 13.) Anderson also attests that Mitchell's age played no role in his decision. (Anderson Decl. ¶ 15.)

Mitchell filed this lawsuit on May 10, 2010.

## II.    STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position[, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). If the

evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247–49).

## III.   LEGAL ANALYSIS

Mitchell asserts that he was a victim of employment discrimination in violation of the ADEA, which prohibits employers from discrimination against an employee because of such individual's age. 29 U.S.C. § 623(a)(1). He also asserts violations of the THRA based on age discrimination. The Tennessee legislature has made clear that the purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the . . . Age Discrimination in Employment Act of 1967, as amended." Tenn. Code Ann. § 4-21-101(a)(1). Thus, the Court will apply the same analysis to the THRA claim and the ADEA claim. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006).

A plaintiff may prove that he was subjected to discriminatory treatment based on his age, in violation of either statute, using either direct or circumstantial evidence. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). The plaintiff here seeks to rely on both, so the Court will consider the defendant's motion in light of the standards applicable to both.

### A.   The Purported Direct Evidence of Discrimination

In discrimination cases, direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences" as to discriminatory motive. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

In responding to Metro's motion for summary judgment, Mitchell relies heavily upon a statement that he contends constitutes direct evidence of discrimination. Specifically, he testified in his deposition that shortly before his meeting with Chief Anderson, one of the supervisors in his chain of command, Lieutenant Gary Whitehouse, called him and said, "[Y]ou are an old officer, and Chief Anderson is going to terminate you. . . . He will terminate you because you're old, of your age." (Mitchell Dep. 156:1–3.)

Mitchell has not offered the affidavit or deposition of Whitehouse (who no longer works for Metro); the only evidence in the record of Whitehouse's statement is Mitchell's account of it.

As an initial matter, it is debatable whether this statement qualifies as "direct" evidence of discrimination. The statement by Whitehouse, assuming it was made, amounts to naked, unsupported speculation and inference by Whitehouse as to Anderson's subjective motivation for his actions. Moreover, as such, even if it were being offered directly by Whitehouse instead of indirectly through Mitchell, the statement would be inadmissible under Rule 701 of the Federal Rules of Evidence. That rule limits opinion testimony from a lay witness to "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Because there is no evidence in the record suggesting that Whitehouse's lay opinion as to Anderson's thought processes was rationally based on Whitehouse's perceptions, it does not fall within the purview of Rule 701. *Cf. Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) ("[I]n an employment discrimination action, Rule 701 . . . bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment action.").

In addition, the statement is inadmissible as hearsay. Under Federal Rule of Evidence 801(c), "hearsay" is a statement, other than one made by the declarant while testifying at the trial or a hearing, offered in evidence to prove the truth of the matter asserted. Hearsay is generally inadmissible, and may not be considered on summary judgment. *Jacklyn*, 176 F.3d at 927. To be sure, Rule 801(d)(2)(D) provides that a statement is "not hearsay" if it is "offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The Court presumes that Mitchell seeks to have the statement admitted as nonhearsay under this rule.

It does not appear, however, that the statement in question falls under Rule 801(d)(2)(D). Under very similar factual circumstances, the Sixth Circuit has held that a statement by a management employee who might otherwise be considered an agent of the employer, but who did not have any involvement or authority in the employment decision that gave rise to the lawsuit, was not a statement concerning "a matter within the scope of [the manager's] agency." *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237

(6th Cir. 1983). The court emphasized that for a statement to be admissible under Rule 801(d)(2)(D), it was necessary to show "that the content of the declarant's statement concerned a matter within the scope of his agency," even though it was not necessary to show that the declarant actually had authority to make the statement. *Id.* In *Hill*, the persons whose statements the plaintiff sought to introduce were in fact managers, but the Court held that the mere fact that each of these men was a "manager" of the defendant corporation was "clearly insufficient to establish that matters bearing upon [the plaintiff's] discharge were within the scope of their employment." *Id.* Because the plaintiff could not show that any of them had participated in the decision to fire the plaintiff, their statements could not be considered as "vicarious admissions" by the defendant. *Id. Cf. Jacklyn,* 176 F.3d at 927–28 (excluding as inadmissible hearsay a district manager's alleged statement to plaintiff that he had overheard the plaintiff's direct supervisor say he did not want "skirts" working for him, on the basis that the plaintiff had failed to show the statement was within the scope of the district manager's agency since he was not involved in the decisions leading up to the plaintiff's termination).

Likewise in the present case, Mitchell has not offered any evidence that Lieutenant Whitehouse was involved in the decision to terminate his employment. Instead, the facts viewed in the light most favorable to Mitchell indicate that the decision to reject the settlement and terminate him was solely Chief Anderson's. Accordingly, the statement is hearsay that does not fall within any exception, and is therefore inadmissible for purposes of ruling on the motion for summary judgment.

Mitchell has not proffered any other direct evidence of discrimination, so the Court will consider the indirect evidence of discrimination in this case.

### B. Indirect Evidence of Discrimination

A plaintiff seeking to establish an ADEA violation using circumstantial evidence must use the familiar *McDonnell Douglas*[2] burden-shifting framework. Under that framework, the plaintiff must first establish a *prima facie* case of discrimination before the burden ever shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004). Generally, in order to establish a *prima facie* case of age discrimination under ADEA, the plaintiff must offer evidence showing that: (1) he was at least forty years

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) after he was rejected, a substantially younger person was selected to replace him (or was selected instead of him, in the case of a request to transfer). *Id.* at 459–60.

Metro argues that it is entitled to summary judgment because Mitchell cannot prove a *prima facie* case of discrimination, the first step in the *McDonnell-Douglas* framework. In particular, Metro contends that Mitchell (1) cannot show that he suffered an adverse employment action and (2) cannot show that he was replaced by or treated disparately from a younger employee. Metro also argues that, even assuming a *prima facie* case is established, Mitchell cannot show that the decision to fire him was motivated by his age.

With respect, first, to the question of whether Mitchell suffered an adverse employment action, Mitchell has proffered evidence in the form of his own testimony that he was given the choice either to resign or be fired, and thus that he was constructively discharged. The defendant disputes whether Mitchell, as a long-term civil servant, could have rationally believed that Anderson had the power to terminate him without pursuing the mandatory grievance process. Regardless, even under the defendant's version of the facts, Mitchell was subject to a disciplinary action insofar as he was informed by then-Deputy Chief Anderson that the Chief would reject the settlement proposal and reopen the investigation into Mitchell's actions and the disciplinary process, based on Chief Anderson's determination that Mitchell had repeatedly lied during the course of the OPA investigation. Subjecting an employee to a disciplinary procedure that could result in his termination is an adverse employment action.

However, with respect to the defendant's second argument, the Court agrees that there is no evidence in the present record regarding whether Mitchell was replaced by a younger employee, or that he was treated less favorably than any younger employee charged with similar behavior. Because the plaintiff bears the burden of proving all the elements of his *prima facie* claim, this failure is fatal to Mitchell's age-discrimination claims. On that basis, Metro's motion for summary judgment will be granted.

Further, even if Mitchell were able to establish a *prima facie* case of age discrimination, Mitchell has not presented any evidence from which a jury could reasonably conclude that the adverse action to which he was subjected was motivated even in part by his age. Mitchell's inability to prove that the

defendant's reasons for its actions are pretextual is also fatal to his claim and provides another basis for summary judgment in the defendant's favor.

**III.    CONCLUSION**

For the reasons set forth herein, the Court finds that defendant Metro is entitled to summary judgment in its favor and dismissal with prejudice of the age-discrimination claims asserted against it. Having dismissed the only claim over which it has original jurisdiction, the Court declines to reach the merits of the plaintiff's state-law breach of contract action and will dismiss that claim without prejudice under the authority of 28 U.S.C. § 1367(c)(3).  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge